16748.   STUDEBAKER CORPORATION OF AMERICA *v.* SMITH *et al.*

JENKINS, P. J.   Under the provisions of the consignment contract, the consignor could take back the shipment within eight months from the invoice date, only by refunding the freight charges advanced by the consignee; but after the expiration of eight months from the date of the shipment the consignor could, without refunding the original freight charges advanced by the consignee, order the return or reshipment of the goods by prepaid or equalized freight, and would be further entitled to an agreed ten per cent. to cover depreciation. The record conclu-. sively shows that after the expiration of about two years from the date of the shipment the consignor exercised its option under the contract, by calling for a return of the goods, freight prepaid, plus ten per cent. agreed depreciation; that the consignees recognized that the consignor was exercising such option, and agreed in writing to respond in accordance with "the provisions of the consignment agreement." Consequently, in a suit by the consignor for the ten per cent. agreed depreciation, plus reshipping freight charges, there could be no judgment in favor of the defendant consignee under the theory that the action of the consignor in ordering such reshipment amounted to a mere revocation of the agreement, and this is true even though a traveling representative of the consignor may have stated to the defendant consignee that the goods had been sold to another, f. o. b. the town of the consignee's residence.

*Judgment reversed. Stephens and Bell, JJ., concur.*

DECIDED APRIL 20, 1926.

Complaint; from Butts superior court—Judge Persons.   June 24, 1925.

STATEMENT OF FACTS BY JENKINS, P. J.

Certain wagons were consigned to the defendants in error by the Studebaker Corporation, under a contract, the 9th clause of which is as follows: "In case you neglect to comply with your undertakings herein, or sell or dispose of the merchandising business in which you are engaged, or if we exercise the right hereby given to terminate this contract because your handling goods of other manufacturers is done to our detriment (of which we shall be the sole judge), or if this contract is terminated by reason of your act or default, or if and when the goods consigned hereunder remain unsold, or sold and unremitted for, eight months from date of each invoice, and if we so elect, you will in such event immediately pay us the invoice price in cash for said goods, or return them to us, freight prepaid, to South Bend, Indiana, or elsewhere as we may direct (freights being equalized), free of all charges, in as good

Factors, 25 C. J. p. 366, n. 64 New; p. 404, n. 31.

condition as when received, paying for damage to goods, if any, cancel your account for freight advanced, and pay us also a sum equal to ten per cent. (10%) of the invoice price of the goods returned, to cover the agreed natural depreciation while in your possession; provided, however, that in case we exercise the right hereby granted to revoke this contract at any time if in our opinion the exigencies of our business so demand, you will ship or transfer said unsold goods as we may direct, and we will pay you the freight advanced upon said goods and waive all claim for natural depreciation; but you agree to pay us for all other damage to said goods while in your possession." The agreement provides also that the contract "embodies our entire understanding, and can not be modified except by writing duly executed by us at our general office in South Bend, Indiana."

One of the defendants testified: "When those wagons were originally shipped to us from South Bend, we paid the freight," amounting to $288.05. He testified also that after the expiration of the eight-months period specified in article 9 of the contract, and after the wagons had remained in the hands of the consignee for about two years, the consignor "began to write us about taking those wagons away; there were no wagons selling in Butts county, or at Macon or at McDonough; we wanted to ship them away so we could get our money that we had tied up in them, and they kept writing and said they were going to ship them back and make us pay 10%, and we asked them to leave them there, and when we saw we could get our money and get our freight back we would turn them aloose, but they claimed they were not going to do that, and we wrote that letter and asked them to allow us to keep them until October, the fall of the year, and if there was any crop made around there, may be we could sell them." The other defendant testified: "The Studebaker Company revoked the contract. We would not have let them have the wagons if they had not done it, because the contract said if they revoked it, they were to pay us the freight back from South Bend to Flovilla, and we were not to pay for any depreciation or anything to any one else. That man Lane came there and told us he wanted us to sign that agreement there, and I told him I was not going to do it, and he said 'why won't you do it?' And I said, 'You are revoking the contract, and I am not going to sign any agreement for you to

sell the wagons anywhere in the United States if you want to and we have the freight to pay.' I said, 'You might sell them in San Francisco or Seattle, Washington, and I am not going to sign any such contract;' and he·said he was going to sell them f. o. b. there. 'You have no depreciation,' he said. ·He admitted in the presence of a witness there that there was no depreciation, that the wagons were as good as when they came from the factory, and he got mad because we would not sign the contract, and he went off down to the hotel and came back that afternoon and asked us to sign the contract. He said under his word he would sell the wagons f. o. b. Flovilla. I told him I could sell them in Macon; and I called up a man in Macon about them. I made an effort to sell the wagons. A man told me he would buy them in two months, if we would keep them there. After that was signed up and he came back to get the wagons, Lane told us he was to sell them f. o. b. We would not have let them have the wagons otherwise. We could have kept them there and sold them ourselves and got our freight back from South Bend, and we would not have had to sacrifice all of that money we paid out on freight. In other words, we shipped those wagons there and paid all that freight from South Bend, Indiana, and we were defrauded from getting one penny out of them, and the Studebaker Corporation did not lose one penny on shipping them from Indiana, and I don't see how they ought to have any money out of us. I don't think they should have any money out of us when they have not lost anything on us, not one penny. The wagons were shipped there in 1920. We kept them two years, good and dry."

The issue submitted to the jury on the trial was whether the consignment contract had been revoked, or whether the plaintiff had exercised its option under the first part of article 9 of the consignment agreement. The plaintiff introduced in evidence a letter addressed to plaintiff and signed by the defendants, dated January 19, 1922, as follows: "Replying to your valued letter of the 11th inst. requesting that we send you check for $448.15 to cover 10 per cent. depreciation on your wagons, we beg to advise that we know that you all want to be as liberal with us as you can, and we are writing to ask that if we are to pay the depreciation, if we would not be entitled to the advance in price on the wagons. You will note that both shipments carried a 15 and 18 per cent.

discount off the list price. This seems fair to us. If you are to make us pay the depreciation, then we would be entitled to the advance in price. In view of the fact that we are not responsible for the existing conditions and that it is no lack of effort to sell the wagons or anything on our part, we are writing to ask you to let us keep them until October 1st. By that time we can see what the fall sale is going to be, and if we do not sell them, we will ship them back to South Bend, or to your order by prepaid freight. In view of the fact that we have already paid the freight, we will lose the freight both ways, which will amount to a considerable sum. Then, too, may be the freight rate will be lower by that time. We are glad to store them for you, and would be glad if you would send your representative here and check the wagons again, and give us another chance to work them off. If you will exchange wheels for three and 2-1/2 inch tires, we believe we can sell them to sawmills in South Georgia or around here. We want to do the right thing always if we know it, and if you refer to your books you will see that we have always met our obligations, and our relations have always been pleasant. In fact we have on hand four or five buggies that we paid you for nearly two years ago, and in view of all this and conditions over which we have no control, we can not believe that you will be unreasonable with us. You asked for a financial statement, and we gladly sent it to you, and you can see from the statement that we haven't any funds available. We assure you that we want to do anything fair to stay out of the courts, for we had rather take the money that we would have to pay out in costs and lawyers and apply it to our debts. We have never had but one case in court, and that was question of $300.00 salary. Although after five years we gained the case in the higher courts, it cost us at least that amount and the embarrassment and trouble. So please do not put the account into the hands of the courts, for we want to do anything fair and do everything possible to keep out. If we will agree to store and do our best to sell the wagons, won't you let them stay here until October 1st? If on that date they remain unsold, we will without delay ship them back prepaid to you, and give you what profit we might have in them, and also lose the freight we have advanced. We will be glad if you will do this, for this will give us time to sell them, and you will make the sale of the wagons and we will get

our money out of them.  We assure you that we will sell them when any wagons are sold we will not wait for the trade to buy them here, but will sell them elsewhere.  Dealers in several places have promised to figure with us when they were in the market again, and we keep in close touch with them.  Please consider exchanging some of the wheels for wider tires and let us see what we can do.  We will spend some money in advertising and try and reach the trade.  In view of the whole situation, please let us know if you will not reconsider and let us keep them a little longer, if not until October 1st, and see if we can't dispose of them. We assure you we are doing our best."

The plaintiff introduced also a communication dated May 27, 1922, signed by the defendants and addressed to the plaintiff, as follows:  "We hereby agree to transfer and or load and ship the Studebaker wagons on hand in our warehouse at Flovilla, Georgia, on your order.  These wagons were shipped us by you under the provisions of the consignment agreement dated August 24, 1917, and we agree to transfer and or reship them under the provisions of this consignment agreement, holding the wagons for you free of storage charges, and shipping by prepaid freight. These wagons represent shipments made on December 19, 1919, and August 11, 1920, and consist of the following:  24 No. 302 light south complete wagons with boxes, no seat or brake.  18 No. 303 medium south complete wagons with boxes, no seat or brake. All wagons equipped with regular tire, wide track, and coach tongue. We agree also to remit you covering the agreed natural depreciation of 10% as provided for in clause nine (9) of the consignment agreement referred to above, dated August 24, 1917."  It appears that the wagons were reshipped from Flovilla in September, 1922. The jury found for the defendants and allowed them by way of recoupment the $288.05 paid by them as original freight charges from South Bend, Indiana, to Flovilla.

*H. M. Fletcher,* for plaintiff.